**STATE of Missouri,
Plaintiff–Respondent,**

v.

**Terry McNAIL, Defendant–Appellant.**

**No. 54513.**

Missouri Court of Appeals,
Eastern District,
Division Four.

Feb. 21, 1989.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 15, 1989.

Application to Transfer Denied
April 18, 1989.

Daniel P. Reardon, Jr., Clayton, for defendant-appellant.

William L. Webster, Atty. Gen., William J. Swift, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

SMITH, Presiding Judge.

Defendant appeals from his conviction of rape and sentence of five years imprisonment based upon a jury verdict. We reverse and remand.

Defendant was charged with two counts of rape. The alleged victim was his daughter, aged respectively 6 and 7 on the dates of the alleged activities. The evidence

against defendant was solely the statements and testimony of his daughter that defendant had sexual intercourse with her. Such evidence was sufficient to make a submissible case. The medical testimony indicated no evidence of recent trauma and an intact hymen on May 21, 1987. The hymen did contain a small "bump" and the vaginal opening was larger than normal for a 7 year old girl. The doctor testified such findings were consistent with sexual abuse and evidenced a "possibility" of such abuse. The findings did not establish that the girl had been abused, or if abuse occurred when and in what manner.

The first occasion of intercourse alleged was on the girl's sixth birthday, March 17, 1986. The second incident allegedly occurred on May 1 or 2, 1987. At the time of the first incident the daughter was in the custody of defendant. When the father and mother were originally divorced in 1981 the mother received custody of the daughter. She maintained that custody until October, 1985, when she voluntarily relinquished it while she underwent psychiatric treatment including hospitalization. Custody was returned to the mother on March 27, 1986. Prior to that return defendant had filed a motion to modify the original decree to vest in him primary custody. During the pendency of this motion some dispute arose concerning defendant's temporary custody rights and a court order was entered re-establishing such rights. The second incident was alleged to have occurred after that court order. The modification proceeding was still pending at the time of the defendant's trial.

On May 13, 1987, a social worker conducted a home study during which she interviewed the daughter in the presence of the mother. The girl made certain statements indicating a possibility of abuse by defendant, but did not indicate any sexual intercourse. At a subsequent interview on May 21 with a social worker of the Abuse and Neglect unit of St. Louis Children's Hospital the daughter told the interviewer about the occurrence on May 1 or 2 and stated that her "Dad had never done that before." She indicated that on the same occasion (or by the social worker's interpre-

tation of the interview, some other occasion) her father made sexual overtures to a neighbor girl, Nancy, when Nancy was spending the night with the daughter at defendant's home. Both Nancy and her mother testified that Nancy had never spent the night at defendant's home because her father would not permit her to spend the night away from home.

The daughter was also interviewed by a police officer. During the various interviews she also identified sexual abuse occurrences (but not intercourse) with two other men, both occurring while she was in her mother's custody. One of these occurrences, involving an "old man" who was a friend of her mother's, she reported to her mother, who called the police and a prosecution for that conduct was pending at the time of defendant's trial. The other occurrence involved a maintenance man at the trailer park where the mother and daughter lived who allegedly inserted a pencil into the daughter's vagina. Mother testified that when the daughter was six, or before, she and daughter had had specific discussions about sex and sexual intercourse and "where babies come from." Prior to the interview on May 13, 1987, daughter had never reported to her mother or anyone else any sexual activity involving her father, although she had previous to that time reported the incident with the "old man." It can be safely stated that the daughter's interviews and her testimony were at times in conflict on relevant questions and less than clear. This is to be expected from a child of that age and the inconsistencies were not sufficient to make her a non-credible witness as a matter of law. Defendant testified that he did none of the acts charged. He also presented considerable evidence from witnesses to refute his access to the child on the dates of the alleged offenses.

■ Defendant raises two points on appeal. One, that the use of anatomically correct dolls during the trial was unduly prejudicial and suggestive, we find to be without merit. The second, that the verdict was coerced, we find to have merit.

The jury received the case for deliberation at 1:05 p.m., January 16, 1988. January 16 was a Saturday and the first day of a three-day state holiday. At approximately 5:30 p.m. the court received a note from the jury as follows:

"What happens when we do not agree 100%? Ten of us have voted guilty on two counts of rape; two have voted not guilty."

Over defendant's objection that further deliberations would result in a coerced verdict, the court responded, "Please continue your deliberations." At approximately 7:45 p.m. the jury forwarded another note to the court as follows:

"I'm sorry but it seems we cannot agree. The two persons differing feel they cannot in good conscience compromise their opinions. How long must we deliberate before a 'hung jury' is declared?"

Again over the objection of defendant the court responded, "Please continue your deliberations." The court then, at 8:07 p.m., again over defendant's objection, gave the "hammer instruction," MAI–CR 3d 312.10. Shortly after 9:00 p.m., pursuant to the court's instruction, the deputy sheriff went to the jury while it was deliberating to obtain from its members a list of the telephone numbers of "prospective relatives or close friends that might be able to bring a change of clothes and proper toiletries for a night's stay at the hotel." The jury was advised by the deputy sheriff that they deserved a break and that they would be taken to a hotel to spend the night. Approximately 10 minutes later, and before the requested information had been received, the jury indicated it had a verdict. Before the jury was returned to the courtroom defendant requested a mistrial on the basis that the verdict had been coerced. This request was denied. The jury verdict acquitted defendant on Count I, the March incident, and found him guilty on Count II, the May incident. Punishment was set by the jury at five years imprisonment, the minimum prescribed punishment.

■ As we stated in *State v. Rojano*, 519 S.W.2d 42 (Mo.App.1975) [9, 10]:

"When it appears from the circumstances that a verdict is coerced by the court, the verdict must be overturned." Where the "totality of the circumstances" demonstrates that the trial court was virtually directing that a verdict be reached a verdict of guilty is the product of coercion and must be set aside. *State v. Mason*, 588 S.W.2d 731 (Mo.App.1979) [1]. In *State v. Holt*, 592 S.W.2d 759 (Mo. banc 1980) [17] the court addressed whether a jury should have been required to continue deliberations when the trial court knew that it stood nine to three for conviction and the jury had indicated its belief that a verdict could not be reached. The court stated that to require further deliberation with such information and after deliberations considerably briefer than those before us would or could make the minority jurors feel "doubtful and apprehensive about continuing to hold out." In *State v. Broadux*, 618 S.W.2d 649 (Mo. banc 1981) a plurality of the court disapproved cases which had extended *State v. Holt* to apply to the giving of the "hammer" instruction whenever the trial court knew of the numerical division of the jury and the position of each division on guilt or innocence and the jury was aware of the court's knowledge. *See, State v. Sanders*, 552 S.W.2d 39 (Mo.App. 1977) and *State v. Johnson*, 610 S.W.2d 101 (Mo.App.1980). The court did not, however, reject the *Holt* rationale that forced continued deliberations under those circumstances could constitute coercion.

■ The totality of the circumstances here bespeak coercion. We have set out the facts favorable to the defendant in some detail because they evidence a rational basis for jury disagreement on defendant's guilt beyond a reasonable doubt. The jury deliberated for approximately seven hours during which time it sent two notes that it was deadlocked. The second note indicated that the two jurors voting not guilty "could not in good conscience compromise their opinions." The jury inquired how long it would be required to deliberate before a hung jury was declared. The court then gave the "hammer" instruction. Another hour of deliberations pro-

duced no verdict. Then the jury was advised, while still deliberating, that it would be held over until the next day, a Sunday, for further deliberations. Approximately ten minutes later a verdict was reached acquitting of one count, convicting on the other and imposing the minimum punishment for a most heinous crime. It is difficult to conceive that under these circumstances the verdict was other than a compromise reached because the trial court had virtually directed that a verdict be reached and by implication indicated it would hold the jury until a verdict was reached.

Conviction reversed and cause remanded for new trial on Count II.

STEPHAN, Jr., and SATZ, JJ., concur.